**NOT FOR PUBLICATION**

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 21-11371
_____

2:11-cv-01047-MHH

BNSF RAILWAY COMPANY,

*Plaintiff-Appellee,*

*versus*

ALABAMA DEPARTMENT OF REVENUE,
CITY OF BIRMINGHAM, ALABAMA,
JEFFERSON COUNTY, ALABAMA,
WALKER COUNTY, ALABAMA,

*Defendants-Appellants,*

VERNON BARNETT,
  Commissioner of the Alabama Department of Revenue,

*Defendant.*

2                    Opinion of the Court                    21-11371

————————————

Appeal from the United States District Court
for the Northern District of Alabama
D.C. Docket No. 2:11-cv-01047-MHH

————————————

————————————

No. 21-13233

————————————

2:11-cv-01047-MHH

BNSF RAILWAY COMPANY,

*Plaintiff-Appellee,*

*versus*

ALABAMA DEPARTMENT OF REVENUE,

VERNON BARNETT,
   Commissioner of Alabama Department of Revenue,
CITY OF BIRMINGHAM, ALABAMA,
JEFFERSON COUNTY, ALABAMA,
WALKER COUNTY, ALABAMA,

*Defendants-Appellants,*

CITY OF BIRMINGHAM,

*Defendant.*

————————————

Appeal from the United States District Court
for the Northern District of Alabama
D.C. Docket No. 2:11-cv-01047-MHH

————————————

Before BRANCH, LUCK, and TJOFLAT, Circuit Judges.

LUCK, Circuit Judge:

The Railroad Revitalization and Regulatory Reform Act (called the 4-R Act) prohibits states from imposing taxes that discriminate against rail carriers. *See* 49 U.S.C. § 11501(b)(4). The State of Alabama assesses a sales and use tax on rail carriers' purchases of diesel fuel; water carriers operating in interstate commerce are exempt. *See* Ala. Code §§ 40-23-2(1), 40-23-61(a), 40-23-4(a)(10). Seven railroads subject to the diesel tax—CSX Transportation, BNSF Railway, Norfolk Southern Railway, Alabama Southern Railroad, Alabama Warrior Railway, Autauga Northern Railroad, and Birmingham Terminal Railway—sued under the 4-R Act (the latter four in the same case) to enjoin the state and various local governments from taxing them but not water carriers. Usually, the Tax Injunction Act precludes any bid for injunctive relief against a state tax, *see* 28 U.S.C. § 1341, but the 4-R Act creates an exception to that rule, *see* 49 U.S.C. § 11501(c).

CSX's case proceeded to judgment first, while the other three were stayed. After years of appeals, we concluded that the state's scheme of taxing rail carriers but exempting water carriers unjustifiably discriminated against CSX under the 4-R Act and directed the district court to enter declaratory and injunctive relief. *CSX Transp., Inc. v. Ala. Dep't of Revenue* (*CSX III*), 888 F.3d 1163, 1187–88 (11th Cir. 2018), *modified on denial of reh'g*, 891 F.3d 927 (11th Cir. 2018) (per curiam). Following our direction, the district court enjoined the state from "imposing . . . the sales and use tax . . . on diesel fuel purchased or used by CSX[] while engaged in

foreign or international commerce or interstate commerce" (quotations omitted).  The stay was then lifted in the other three cases and they were consolidated.

Ultimately, the district court overseeing the consolidated cases granted judgment on the pleadings for the railroads.  It declared that the diesel tax violated the 4-R Act and enjoined the state and the local governments from assessing the tax as to those railroads.  This appeal followed.

We affirm.  Under the 4-R Act, the pleadings had to show that the railroads provided transportation on the interstate rail network, that the diesel tax was a tax within the meaning of the 4-R Act, and that the diesel tax discriminated against the railroads.  They did.  The state didn't dispute that the diesel tax fell within the scope of the Act.  It also admitted that the railroads engaged in interstate commerce as rail carriers, effectively admitting that they operated on the interstate rail network.  And the state was judicially estopped from denying that the diesel tax discriminated against railroads in favor of their principal competitors, water carriers.  The railroads were therefore entitled to judgment against the state.

Because the state was prohibited under the 4-R Act from exercising its taxing authority to impose the discriminatory diesel tax on the railroads but not on water carriers, the local governments couldn't exercise the same taxing authority delegated from the state to impose the same discriminatory tax.  So the local governments were also barred from collecting the diesel tax.

## I.   FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A.  THE STATE'S DIESEL TAX

The State of Alabama taxes the sale and use of diesel. *See* Ala. Code §§ 40-23-2(1) (sales tax), 40-23-61(a) (use tax). It also delegates some of its taxing authority to counties and municipalities to impose diesel taxes parallel to the state's, increasing the aggregate burden on the sale and use of diesel. *See id.* §§ 11-3-11.2 (parallel county taxing authority), 11-51-200 (parallel municipality taxing authority). Rail carriers in Alabama must pay these state and local taxes. But motor carriers and water carriers operating in foreign or interstate commerce are exempt. *Id.* §§ 40-17-325(b) (motor-carrier exemption), 40-23-4(a)(10) (water-carrier exemption).

### B.  THE CSX LITIGATION

In *CSX III*, we set out the procedural history of the CSX litigation "in some detail" because "it [wa]s all pretty much relevant" to our decision. *CSX III*, 888 F.3d at 1169. Some of that history bears repeating now.

CSX sued the Alabama Department of Revenue in 2008. *Id.* As we previewed, CSX sought to enjoin Alabama "from collecting the sales and use tax on [its] purchase or consumption of diesel fuel in the state." *Id.* It also sought a declaratory judgment that the state violated the 4-R Act by taxing rail carriers' purchase of diesel fuel but exempting motor and water carriers. *Id.* at 1168–69.

That suit kicked off an eleven-year litigation saga. Initially, we affirmed the district court's dismissal of CSX's complaint. *Id.* at

1169 (citing *CSX Transp., Inc. v. Ala. Dep't of Revenue*, 350 F. App'x 318, 319 (11th Cir. 2009) (per curiam), *rev'd*, 562 U.S. 277 (2011)). We'd previously held that exempting motor and water carriers from generally applicable taxes didn't discriminate against rail carriers under the 4-R Act; that precedent foreclosed CSX's suit. *Id.* at 1169–70 (citing *Norfolk S. Ry. Co. v. Ala. Dep't of Revenue*, 550 F.3d 1306 (11th Cir. 2008), *abrogated by CSX Transp., Inc. v. Ala. Dep't of Revenue (CSX I)*, 562 U.S. 277, 288 (2011)). The Supreme Court abrogated our prior precedent and reversed, holding that "a state excise tax that applies to railroads but exempts their interstate competitors is subject to challenge under subsection (b)(4)" of the 4-R Act. *CSX I*, 562 U.S. at 288. It remanded for the parties to litigate whether the state could "offer[] a sufficient justification for declining to provide the exemption at issue to rail carriers." *Id.* at 288 n.8.

Back before the district court, the case proceeded to a bench trial in April 2012. The district court explained that the goal of the trial was to "ascertain whether the state adequately justifie[d] the sales and use tax exemptions for rail carrier[s'] principal competitors." *CSX Transp., Inc. v. Ala. Dep't of Revenue*, 892 F. Supp. 2d 1300, 1312 (N.D. Ala. 2012), *rev'd*, 720 F.3d 863 (11th Cir. 2013), *rev'd*, 575 U.S. 21 (2015). It didn't have to determine the rail carriers' principal competitors because the parties had stipulated to that fact before the trial:

> The principal competitors to rail carriers in the transportation of property in interstate commerce in the State of Alabama are on-highway motor carriers of property in interstate commerce ("motor carriers")

> and carriers of property in interstate commerce by
> ships, barges and other vessels ("water carriers").

That stipulation wasn't surprising; the state had admitted in its May 2008 answer that rail carriers principally compete with motor and water carriers, and repeated that admission in its June 2008 preliminary injunction opposition and April 2012 pretrial briefing.

Taking the principal-competition fact as a given, the district court concluded that the motor- and water-carrier exemptions didn't discriminate against railroads. *Id.* at 1312–17. Motor carriers, it explained, bore a "substantially similar" tax burden under a different state levy, so it was fair to exempt them from the diesel tax; as for water carriers, the district court found that the state had a rational basis for exempting them from any kind of tax. *Id.* at 1313–14, 1317. Since the exemptions for both motor and water carriers were justifiable, the district court concluded that CSX had "failed to meet its burden of proof that it suffered from discrimination." *Id.* at 1314, 1317.

We reversed, holding that the district court had misallocated the burden of proof. *CSX Transp., Inc. v. Ala. Dep't of Revenue*, 720 F.3d 863, 865 (11th Cir. 2013), *rev'd*, 575 U.S. 21 (2015). Like the district court, we took the question before us to be "whether exempting CSX's main competitors from the [s]tate's sales tax is discriminatory as to rail carriers in violation of the [4-R Act]." *Id.* We confirmed that comparing the rail carriers to their competitors— the "competitive approach"—was the right methodology. *Id.* at 867–69. Then, like the district court, we accepted that "rail carriers'

main competitors" were motor and water carriers.  *Id.* at 871.  All CSX had to do to carry its burden, we held, was show that it was treated differently from those other carriers.  *Id.*  Once it did so, "[t]he burden shifted to the [s]tate to provide a 'sufficient justification' for the exemptions."  *Id.*  We concluded that the state hadn't carried that burden, so we ordered the district court to grant judgment for CSX.  *Id.*

The Supreme Court didn't completely agree.  *Ala. Dep't of Revenue v. CSX Transp., Inc. (CSX II)*, 575 U.S. 21, 30 (2015).  It held that we'd "properly concluded that, in light of [CSX]'s complaint and the parties' stipulation, a comparison class of competitors consisting of motor carriers and water carriers was appropriate, and differential treatment vis-à-vis that class would constitute discrimination."  *Id.*  But because we'd "failed to examine" the state's "other justifications" for the motor- and water-carrier exemptions, the Court remanded the case again.  *Id.* at 32.  We in turn remanded the case to the district court.  *CSX Transp., Inc. v. Ala. Dep't of Revenue*, 797 F.3d 1293, 1294 (11th Cir. 2015) (per curiam).

After a second bench trial in July 2016—subject to the same factual stipulations as the first—the district court concluded that the motor- and water-carrier exemptions were justified.  *CSX Transp., Inc. v. Ala. Dep't of Revenue*, 247 F. Supp. 3d 1240, 1255 (N.D. Ala. 2017), *rev'd*, 888 F.3d 1163 (11th Cir. 2018), *modified on denial of reh'g*, 891 F.3d 927 (11th Cir. 2018) (per curiam).  With respect to water carriers in particular, the district court found that "although the parties stipulated that water carriers are one of CSX's two

21-11371                 Opinion of the Court                 9

principal competitors in Alabama, the evidence showed a lack of substantial competition between water carriers and CSX." *Id.* at 1246. It therefore entered an order "dismissing CSX's claims with prejudice." *Id.* at 1255. Again, CSX appealed.

"The question before us" in *CSX III* "[wa]s whether Alabama's tax scheme, which imposes either a sales or use tax on rail carriers when they buy or consume diesel fuel but exempts competing motor and water carriers from those taxes, violates the [4-R] Act." *CSX III*, 888 F.3d at 1168. We held that the state's motor-carrier exemption didn't violate the Act because the state imposed a diesel excise tax on motor carriers that was "roughly equivalent" to the diesel tax imposed on the railroads. *Id.* at 1179. But the state's water-carrier exemption did violate the Act; water carriers weren't subject to any "roughly equivalent" tax, and the state couldn't offer any other justification for exempting them. *Id.* at 1187. We added that we were both "hard pressed to square a finding that competition between CSX and water carriers is insubstantial with a stipulation that they are 'principal competitors,'" and "supremely reluctant" to "relitigate a stipulated fact that the Supreme Court [had] relied on for one of its holdings, which [wa]s that rail carriers and water carriers are a similarly situated comparison class." *Id.* at 1180 (citing *CSX II*, 575 U.S. at 30). We therefore concluded that CSX was "entitled to relief from the [s]tate's discrimination that violates the 4-R Act." *Id.* at 1187.

After we handed down our decision, the state petitioned for rehearing so that we could clarify our holding for the benefit of the

parties in "approximately [thirty] additional federal and state cases involving" the same tax.  We granted the petition and clarified our conclusion on the water-carrier exemption:

> As long as the [s]tate retains the sales and use tax exemption for diesel fuel used by water carriers "engaged in foreign or international commerce or in interstate commerce," Ala. Code §§ 40-23-4(a)(10), 40-23-62(3), the 4-R Act forbids it from imposing the sales and use tax on diesel fuel used by rail carriers "engaged in foreign or international commerce or in interstate commerce."  Our opinion should be read with that imperative in mind.

*Id.*  In the end, we remanded the case to the district court to enter declaratory and injunctive relief for CSX.  *Id.* at 1187–88.

## C.  THE REMAINING CASES

While the CSX litigation advanced through rounds of appeals, six other railroads filed three other cases challenging the same tax.  First, in 2011, BNSF Railway sued the Alabama Department of Revenue, the department's commissioner, the City of Birmingham, Jefferson County, and Walker County.  Second, in 2013, Norfolk Southern Railway sued the Alabama Department of Revenue, the department's commissioner, the City of Irondale, the city's treasurer, Colbert County, and the county's revenue commissioner.  Third, in 2014, Alabama Southern Railroad, Alabama Warrior Railway, Autauga Northern Railroad, and Birmingham Terminal Railway sued the Alabama Department of Revenue, the department's commissioner, Jefferson County, Jefferson County's tax

assessors and tax collector, the City of Fairfield, the City of Fairfield's finance director, the City of Birmingham, the City of Birmingham's finance director, the City of Tuscaloosa, the City of Tuscaloosa's finance director, Autauga County, and Autauga County's revenue commissioner.

In each of these three cases, the railroads alleged that they were operating in interstate commerce, that their principal competitors were motor and water carriers, and that the state and local governments violated the 4-R Act by taxing them but not water carriers for their purchases and use of diesel. The state generally responded to the cases by requesting a stay because the cases were identical to the earlier-filed CSX litigation. The district court stayed the cases while the CSX litigation moved through the appellate process.

The state also answered each complaint.[1] It admitted or failed to deny that the railroads were engaged in interstate commerce and that they were subject to the state's diesel tax. But it denied that water carriers were the principal competitors to these rail carriers, sharply departing from its stipulation to that effect in the CSX litigation. The local governments (besides the City of Irondale) also answered the complaints.

---

[1] Notwithstanding the stay, the district court permitted the plaintiffs to file amended complaints in the BNSF and Norfolk Southern cases. It then allowed the defendants to answer. In the Alabama Southern cases, both sides filed amended pleadings before the case was stayed.

After we finally resolved the CSX litigation, the railroads moved for judgment on the pleadings.  Judgment on the pleadings was appropriate against the state, the railroads explained, because the state had admitted that the railroads were within the language we added to *CSX III*:  the state admitted that the railroads engaged in interstate commerce and that water carriers were still exempt from the diesel tax.  And the state was judicially estopped from denying that the railroads' principal competitors were water carriers.

The district court consolidated the three cases and granted judgment on the pleadings for the railroads and against the defendants.[2]  The state, the court found, was judicially estopped from contradicting its stipulation and had admitted that the railroads engaged in interstate commerce.  Then, the court pointed to our "binding" conclusion in *CSX III* that "[a]s long as the [s]tate retain[ed] the sales and use tax exemption for diesel fuel used by water carriers . . . the 4-R Act forbids it from imposing [the] tax on diesel fuel used by rail carriers."  Because the state had admitted that the railroads engaged in interstate commerce and couldn't deny that they competed with water carriers, it couldn't avoid the holding of *CSX III*.  As to the local governments, the district court explained that because they "derive[d] their taxing authority from

---

[2] The district court didn't initially enter judgment on the pleadings against the City of Irondale because the city had a pending motion to dismiss Norfolk Southern's complaint.  Instead, the district court denied the city's motion to dismiss, the city answered, and then the district court entered judgment on the pleadings in a separate order.

the [s]tate," and because local taxes "must [as a matter of state law] parallel state sales and use taxes," "if the [s]tate [could not] levy the sales and use tax, then neither [could]" the local governments.

Ultimately, the district court enjoined the state and the local governments from collecting the diesel tax while they maintained the water-carrier exemption. The state and the local governments appealed the judgment.

## II. STANDARD OF REVIEW

"We review *de novo* an order granting judgment on the pleadings." *Samara v. Taylor*, 38 F.4th 141, 149 (11th Cir. 2022) (quoting *Perez v. Wells Fargo N.A.*, 774 F.3d 1329, 1335 (11th Cir. 2014)). "Judgment on the pleadings under [Federal Rule of Civil Procedure] 12(c) is appropriate when there are no material facts in dispute, and judgment may be rendered by considering the substance of the pleadings and any judicially noticed facts." *Horsley v. Rivera*, 292 F.3d 695, 700 (11th Cir. 2002) (citing *Hawthorne v. Mac Adjustment, Inc.*, 140 F.3d 1367, 1370 (11th Cir. 1998)). "We must accept the facts alleged in the complaint as true and view them in the light most favorable to the nonmoving party." *Samara*, 38 F.4th at 149 (quoting *Cannon v. City of West Palm Beach*, 250 F.3d 1299, 1301 (11th Cir. 2001)).

## III. DISCUSSION

The 4-R Act provides that a state may not "[i]mpose another tax that discriminates against a rail carrier providing transportation subject to the jurisdiction of the [Surface Transportation] Board." 49 U.S.C. § 11501(b)(4). That means, to plead a discriminatory-

taxation claim, a plaintiff must allege three elements:  first, that it's "a rail carrier" subject to the jurisdiction of the Board (which means that it provides transportation on the interstate rail network); second, that the challenged state act is "another tax" within the meaning of the 4-R Act; and third, that the challenged tax "discriminates" against the rail carrier.

Here, the state didn't and doesn't dispute the second element.  The diesel tax was "another tax" under the 4-R Act. *See id.*

The state does challenge the first and third elements, but to no avail.  Because the railroads pleaded—and the state admitted—that they engaged in interstate commerce as rail carriers, the first element was effectively satisfied.  And because the railroads pleaded—and the state was judicially estopped from denying—that the diesel tax discriminated against them in favor of their principal competitors (water carriers), the third element was also satisfied.  With all the elements established, the district court didn't err in granting judgment on the pleadings against the state.

## A.  TRANSPORTATION ON
## THE INTERSTATE RAIL NETWORK

By admitting that the railroads engaged in interstate commerce, the state admitted the first element of the railroads' discriminatory-taxation claim:  that they're "rail carrier[s] providing transportation subject to the jurisdiction of the [Surface Transportation] Board." *Id.*

### 1. *Standard*

Only rail carriers engaged in transportation on the interstate rail network may challenge discriminatory taxation under the 4-R Act. The 4-R Act defines "transportation" as the instrumentalities and services "related to the movement of passengers or property . . . by rail," including "locomotive[s], car[s], vehicle[s], [and] vessel[s]." *Id.* § 10102(9)(A)–(B). "[T]ransportation" is subject to the board's jurisdiction when it occurs "between a place in a [s]tate and a place in the same or another [s]tate as part of the interstate rail network." *Id.* § 10501(a)(2)(A). Like "highways, . . . navigable waters, and airspace," "railroads" are channels of interstate commerce. *E.g.*, *United States v. Ballinger*, 395 F.3d 1218, 1225–26 (11th Cir. 2005) (en banc) (citations omitted).

### 2. *Analysis*

The state admitted that each railroad does business as an interstate rail carrier. It admitted that "BNSF is engaged in interstate commerce as a common carrier by railroad," and that each of the four Alabama Southern railroads was "authorized to do business in the [s]tate of Alabama as an interstate carrier by rail." As for Norfolk Southern, the state didn't deny—and therefore admitted, Fed. R. Civ. P. 8(b)(6)—that "Norfolk Southern is authorized to do business in the State of Alabama as an interstate carrier by rail." These admissions foreclose any dispute over whether the railroads were "rail carrier[s] providing transportation subject to the jurisdiction of the Board." *See* 49 U.S.C. § 11501(b)(4).

The state protests that "there [we]re no allegations . . . describing the activities of [individual] locomotives or the relationship the [railroads'] activity has to interstate commerce," but that's not what's required under the 4-R Act.  If the railroads "engage[] in interstate commerce as a common carrier by railroad" or "do business . . . as . . . interstate carrier[s] by rail," as the state has conceded, they necessarily move "passengers or property" along "the interstate rail network."  49 U.S.C. §§ 10102(9)(A), 10501(a)(2)(A). The pleadings therefore show that the railroads were "rail carriers" engaged in the kind of "transportation" required by the 4-R Act. Because of the state's admission, the railroads were entitled to judgment on the pleadings on this element.

## B.  DISCRIMINATION

With the first element admitted, and the second element undisputed, all that's left to decide as to the state is whether the pleadings establish that the diesel tax discriminates against the railroads within the meaning of the 4-R Act.  "[A] tax discriminates under subsection (b)(4) [of the 4-R Act] when it treats 'groups [that] are similarly situated' differently without sufficient 'justification for the difference in treatment.'"  *CSX II*, 575 U.S. at 26 (third alteration in original) (quoting *CSX I*, 562 U.S. at 287).

The combined holding of the Supreme Court's decisions in *CSX I* and *CSX II* was that Alabama's diesel tax does discriminate against rail carriers in favor of their interstate competitors, including water carriers.  *CSX III*, 888 F.3d at 1180 ("[T]he two of th[ose] decisions] combined decided that discriminatory taxation had been

shown . . . .").  That was why we explained at the end of our opinion in *CSX III* that the state couldn't continue to tax rail carriers while exempting water carriers.  *Id.* at 1187.

But whether Alabama rail and water carriers actually compete was never litigated during the CSX litigation.  Instead, the parties stipulated to that fact, and the state now denies it.  Whether the pleadings establish discrimination depends, then, on whether we hold the state to its CSX stipulation.

The district court did by judicially estopping the state from denying that rail carriers principally compete with water carriers in Alabama.  It did not abuse its discretion in doing so.

### 1.  Standard

Judicial estoppel is an equitable doctrine "intended to 'prevent the perversion of the judicial process' and 'protect its integrity by prohibiting parties from deliberately changing positions according to the exigencies of the moment.'"  *Slater v. U.S. Steel Corp.*, 871 F.3d 1174, 1180 (11th Cir. 2017) (en banc) (citation modified) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 749–50 (2001)).  We've recognized "[t]wo different tests govern[ing] judicial estoppel's application, depending on whether the party seeking to apply it was a party to the prior proceeding in which the other party took an inconsistent position."  *United States v. Munoz*, 112 F.4th 923, 934 (11th Cir. 2024).

Where "the party seeking to apply judicial estoppel . . . was a party to the prior lawsuit," we apply a three-factor test used by the Supreme Court in *New Hampshire v. Maine*.  *Slater*, 871 F.3d at

1182, 1181–82 (citing *New Hampshire*, 532 U.S. at 745, 750–51, 753). First, the party's two positions must be "clearly inconsistent." *New Hampshire*, 532 U.S. at 750. Second, the party resisting estoppel must have "succeeded in persuading a court to accept [its] earlier position." *Id.* And third, the party resisting estoppel must "derive an unfair advantage or impose an unfair detriment on [its opponent] if not estopped." *Id.* at 751.

Where the party seeking to apply judicial estoppel wasn't a party to the prior lawsuit, however, we apply a "two-part test" from our own precedent. *Slater*, 871 F.3d at 1182. Under that test, we look to "(1) [whether] the party [resisting estoppel] took an inconsistent position under oath in a separate proceeding, and (2) [whether] these inconsistent positions were calculated to make a mockery of the judicial system." *Id.* at 1181 (citation modified).

We've described the two parts of our test variously as "elements," *Salomon Smith Barney, Inc. v. Harvey*, 260 F.3d 1302, 1308 (11th Cir. 2001), *judgment vacated on unrelated grounds*, 537 U.S. 1085 (2002) (mem.), "factors," *Ajaka v. Brooksamerica Mortg. Corp.*, 453 F.3d 1339, 1344 (11th Cir. 2006), and "prong[s]," *Smith v. Haynes & Haynes P.C.*, 940 F.3d 635, 644 (11th Cir. 2019). The best reading is that they're non-exhaustive elements. We've never allowed district courts to apply judicial estoppel to benefit a non-party to the earlier proceeding without concluding that both the inconsistency and the mockery elements were satisfied. We've also left room for district courts to look beyond those elements as appropriate. *See, e.g.*, *Ajaka*, 453 F.3d at 1344 (explaining that the test for "determining

whether to apply judicial estoppel" is "not inflexible or exhaustive"); *accord New Hampshire*, 532 U.S. at 751 ("Additional considerations may inform the [judicial-estoppel] doctrine's application in specific factual contexts."). For example, although "[t]he doctrine does not require a showing that the adverse party relied on the inconsistent statement or was injured by it," *Smith*, 940 F.3d at 643, or that the party seeking to avoid estoppel somehow obtained some other benefit, *see Weakley v. Eagle Logistics*, 894 F.3d 1244, 1246 (11th Cir. 2018) (considering the party's possible financial benefit from the inconsistent statement), or that any court accepted the inconsistent statement, *see New Hampshire*, 532 U.S. at 750 (describing that inquiry as an aspect of the three-factor test), such showings go to the equities—and judicial estoppel is, at bottom, an equitable doctrine.

Whether a party has taken inconsistent positions in different proceedings tends to be self-evident. There are a few nuances. One is that even though we've said that the inconsistent position must have been made "under oath," *e.g.*, *Slater*, 871 F.3d at 1181, we've recognized that this "requirement . . . is not inflexible or exhaustive," *Smith*, 940 F.3d at 643 n.4 (citation modified).

Whether a party's inconsistent positions make a mockery of the court is slightly less straightforward. *Cf. Munoz*, 112 F.4th at 935 n.5 ("[T]he meaning of the [make-a-mockery] phrase is not self-evident."). The touchstone for the mockery analysis is whether the party resisting estoppel intended to "mislead the court," "manipulate the judicial system to his advantage," or "misuse the judicial

process." *Slater*, 871 F.3d at 1186. In evaluating the party's intent, we "consider all the [relevant] facts and circumstances of the case." *Id.* at 1189; *see also id.* at 1185 n.9, 1188 (explaining that courts must consider any relevant "fact or factor" or "circumstance[]"). Judicial estoppel shouldn't apply unless the party's "conduct is egregious enough that the situation 'demand[s] equitable intervention.'" *Id.* at 1187 (alteration in original) (quoting *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 248 (1944)). We therefore don't apply it when, for instance, "the inconsistent positions were the result of 'inadvertence[] or mistake.'" *Id.* at 1181 (alteration in original) (quoting *Johnson Serv. Co. v. Transamerica Ins. Co.*, 485 F.2d 164, 175 (5th Cir. 1973)). Nor does it apply "[w]hen a [party] intended no deception." *Id.* at 1187.

"Because judicial estoppel is an equitable doctrine, we review the district court's decision to apply the doctrine for abuse of discretion." *Id.* at 1180 n.4. But the second estoppel element—the party's intent (based on the relevant facts and circumstances)—"is considered a factual finding . . . and [is] held to a clearly erroneous standard." *Robinson v. Tyson Foods, Inc.*, 595 F.3d 1269, 1275 (11th Cir. 2010). To make that finding, a district court may hold an evidentiary hearing, but "intent may [also] be inferred from the record." *Id.* The court may not, however, simply infer intent based on "the fact that the [party] could potentially benefit from" the inconsistent statement. *Slater*, 871 F.3d at 1182; *see id.* at 1185 (overruling cases that allowed courts to "look[] solely to whether" the party made an inconsistent statement "to determine the [party's] intent").

### 2. Analysis

With this standard in mind, we conclude that the district court didn't abuse its discretion when it judicially estopped the state from denying that the railroads principally compete with water carriers.

### a.  The State Took Inconsistent Positions

As to the first element of the *Slater* test, the district court correctly concluded that the state took inconsistent positions. Again, in the CSX litigation, the state made the following stipulation:

> The principal competitors to rail carriers in the transportation of property in interstate commerce in the State of Alabama are on-highway motor carriers of property in interstate commerce ("motor carriers") and carriers of property in interstate commerce by ships, barges and other vessels ("water carriers").

That's a stipulation of fact.[3]  Its language is unambiguous and unqualified.  It doesn't say that, generally, the "principal competitors" to rail carriers are water carriers.  Nor does it say that the "principal

---

[3] The state agrees that "the CSX [s]tipulation . . . was a factual concession."  It's right to do so.  As we've recognized in various contexts, "[w]hether parties have engaged in competition is normally a question of fact."  *Eutectic Corp. v. Astralloy-Vulcan Corp.*, 510 F.2d 1111, 1114 (5th Cir. 1975); *cf. Polypore Int'l, Inc. v. F.T.C.*, 686 F.3d 1208, 1217 (11th Cir. 2012) (explaining that the exercise of "[d]efining a relevant product market" "is a factual question" because it aims to describe the ability of similar producers "to take significant amounts of business away from each other").

competitors" to some rail carriers are water carriers.  Nor does it say that the state is merely agreeing not to contest the existence of competition.  Like the district court, we take the state's stipulation to mean exactly what it says:  in Alabama, the principal competitors to rail carriers are water carriers.  Since the railroads are rail carriers, their principal competitors in Alabama are water carriers.  Is the state now taking an inconsistent position by denying that the railroads' principal competitors in Alabama are water carriers? Yes, it is.

The state urges us to fault the district court for not "reconciling" its unqualified stipulation in the CSX litigation with its denials here.  Citing two out-of-circuit cases, the state argues that "if there is a way to reconcile the two positions, then application of judicial estoppel is not warranted." *See Ashmore v. CGI Grp., Inc.*, 923 F.3d 260, 272 (2d Cir. 2019); *Kirk v. Schaeffler Grp. USA, Inc.*, 887 F.3d 376, 385 (8th Cir. 2018).  The state meant to make a case-specific stipulation in the CSX litigation, it explains; factual stipulations "[normally] are binding for the purpose of the case in which [they] are made, not in separate and subsequent cases."[4] *In re Raiford*, 695 F.2d 521, 523 (11th Cir. 1983).  According to the state, it "makes no sense" for the district court to have read the CSX stipulation to include rail carriers beyond CSX itself because "[p]arties cannot . . . consider every potential litigant in every future case when crafting stipulations to streamline the case at hand."  Ostensibly,

---

[4] Judicial estoppel constitutes one exception to that normal principle. *See Slater*, 871 F.3d at 1180.

we can reconcile the state's CSX stipulation with its denials here by treating it as a mere generalization:

> As a basic illustration, a general statement that dogs are good pets for young children can exist in harmony with, and is not clearly inconsistent with, specific denials that rottweilers or pit bulls are good pets for young children.  So too the general CSX [s]tipulation and the [s]tate's specific denials here.

We're not persuaded.[5]  Of course, before we apply judicial estoppel, we must assure ourselves that a party's earlier and later factual positions actually are inconsistent.  *E.g.*, *United Kingdom v. United States*, 238 F.3d 1312, 1324 (11th Cir. 2001) (holding that the Government didn't take inconsistent positions when it "agreed to disclose certain information in response to limited initial requests, but then declined to do so again when the scope of the requests expanded to include . . . different information").  And we don't construe a party's positions to conflict when there's ambiguity.  *See, e.g.*, *Palmer & Cay, Inc. v. Marsh & McLennan Cos., Inc.*, 404 F.3d

---

[5] The Eighth Circuit's decision in *Kirk* is especially inapposite because it dealt with judicial estoppel under Missouri law in a diversity case.  *Kirk*, 887 F.3d at 383–84.  Like the Eighth Circuit, we apply the relevant state's law of judicial estoppel in diversity cases.  *Original Appalachian Artworks, Inc. v. S. Diamond Assocs., Inc.*, 44 F.3d 925, 930 (11th Cir. 1995) (per curiam) ("Because this is a diversity case, the application of the doctrine of judicial estoppel is governed by state law.").  In federal-question cases like the one before us, however, we apply our own doctrine of judicial estoppel.  *See, e.g.*, *Slater*, 871 F.3d at 1177, 1182 (announcing our two-part test in an appeal from summary judgment on claims arising under Title VII and § 1981).

1297, 1307 n.16 (11th Cir. 2005) (concluding that the "thrust" of a party's earlier legal argument wasn't inconsistent with its later legal argument).

But we're not required to contort the words of an earlier factual statement to make it not inconsistent with a later one. And there's no basis to do so here. For one thing, qualifiers like "generally" or "some" are nowhere to be found in the stipulation. For another, we'd have to ascribe two different meanings to the state's factual stipulation, one of which would have rendered the stipulation useless in the very proceeding in which it was made. The stipulation streamlined the factual issues in the CSX litigation only because CSX, the plaintiff, was included in the set of rail carriers the state meant to identify. If the state had merely stipulated that, generally (or some, or less than all), rail carriers principally compete with water carriers, the parties would still have had to litigate whether CSX itself competed with water carriers.

It therefore wasn't an abuse of discretion for the district court to give the stipulation its plain meaning. It couldn't have done otherwise, linguistically or logically. As the state concedes, the state could easily have said exactly what it now wishes it'd said: "the inclusion of language specifically identifying CSX would [have] render[ed] the CSX [s]tipulation and the [s]tate's specific denials in these cases clearly consistent." More precise language would also have obviated any need for the state to "consider every potential litigant in every future case." That we're holding the state to the factual position it took instead of pretending it said

something narrower (or took no position at all) doesn't mean we're "discourag[ing]" future litigants from stipulating "for fear that a court might . . . strip a stipulation from its context and apply it against [them]" in future proceedings.  It just means that parties must think carefully about the words they use in court.  That's not too much to ask.

None of the cases the state cites compel a different outcome. In *Hoefling*, we held that "judicial estoppel just d[id] not apply" to "prevent[] [the plaintiff] from filing a second amended complaint that rejected [] information contained in the reports he attached as exhibits to the earlier complaint[]" because the plaintiff had always rejected the information in those reports.  *Hoefling v. City of Miami*, 811 F.3d 1271, 1278–79 (11th Cir. 2016).  In other words, judicial estoppel didn't apply because the plaintiff had never changed his position.  Here, in contrast, the state did change its position:  it previously told us that rail carriers compete with water carriers but now tells us the opposite.

Similarly, in *Prison Legal News*, we explained that judicial estoppel didn't apply to two different factual positions taken by the Florida Department of Corrections in different cases.  *Prison Legal News v. Sec'y, Fla. Dep't of Corr.*, 890 F.3d 954, 969 n.12 (11th Cir. 2018).  In the first case, the department took the position that prison-magazine advertisements for prohibited services weren't security threats "as long as they remained incidental in terms of their size and number."  *Id.*  In the second, it took the position that different advertisements for prohibited services—no longer

incidental, but rather "more prominent" than the first set because "the size and number of th[ose] ads [had] increased"—were a security threat. *Id*. The department had "never represented that [prohibited-service] ads present no security threat" categorically, *id*., so its different positions weren't inconsistent for estoppel purposes. If the department had represented that prohibited-service ads were never a security threat, then its position in the second proceeding that some prohibited-service ads were security threats would have been a contradiction. And that's almost exactly what the state did here. In the CSX litigation, it told us that, in Alabama, rail carriers compete with water carriers. Now it's telling us that some rail carriers don't compete with water carriers.

### b. The State's Change in Positions Was Calculated to Make a Mockery of the Courts

As to the second element of the *Slater* test, the district court didn't clearly err when it determined that the state's change in positions was calculated to make a mockery of the courts. The district court analyzed "the totality of the circumstances surrounding" the stipulation. It was most swayed by the state's decision to strategically reverse course on a stipulated fact solely because intervening court decisions had, in the state's words, made that fact "go[] from irrelevant to paramount." It also noted that the state benefitted from a discovery stay in the consolidated cases grounded on its stipulation. The state, for its part, never suggested to the district court that its CSX stipulation was the product of inadvertence or mistake. We see no clear error in the district court's inference about the

state's intent. Plus, the district court noted that both our court and the Supreme Court had relied on the state's stipulation. That was another reason to apply judicial estoppel.

For years, the state repeatedly represented in the CSX litigation that the principal competitors to rail carriers were water and motor carriers—first in its May 2008 answer, again before its June 2008 preliminary injunction hearing, a third time in April 2012 before the first bench trial, and again in July 2016 before the second bench trial. Meanwhile, in the BNSF litigation, the state claimed in its April 2011 answer that it "d[id] not have sufficient information to either admit or deny whether [water carriers] are at this time a principal competitor to rail carriers, due to changed maritime conditions in Alabama because of the BP oil spill." After we adopted the so-called "competitive approach" in July 2013—an approach the state had opposed—all the state's subsequent answers outright denied that the other rail carriers principally compete with water and motor carriers. Yet the professed uncertainty occasioned by the BP disaster didn't stop the state from repeating the broad stipulation in the CSX litigation in April 2012 after the BP oil spill. Nor did the state's revised understanding of the facts after July 2013 stop it from repeating the stipulation again in July 2016. Like the district court, we don't see how to square these contradictions.

By taking inconsistent factual positions across cases, the state was able to hedge its bets. As we explained, the other rail-roads' cases were stayed while the CSX litigation was pending, re-lieving the state of the burden of discovery while it tried to

vindicate its preferred reading of the 4-R Act. It made sense at the time for the district court to stay those cases; if the stipulation was true and railroads indeed principally competed with motor and water carriers, discovery on competition was equally unnecessary as to the other railroads. Likewise, the state took various legal positions throughout the CSX litigation, all of which aimed to nullify the relevance of competition. If the state won on any of those legal positions, discovery on competition would be irrelevant. The district court found that the state "delayed discovery regarding competition in the consolidated cases for years in the hope that it could use its broad stipulation to avoid discovery altogether" in the consolidated cases. By the same token, if it lost on all those legal positions (as it ultimately did), its denials in the other cases would ensure that it could carry on the struggle.

While the district court did not make an explicit finding that the state intended to mislead the courts by making inconsistent statements, it made factual findings leading to that conclusion. It thus did not abuse its discretion by applying judicial estoppel in this case.

As an additional relevant consideration, it's also very clear that multiple courts relied on the state's CSX stipulation. As the district court correctly noted, the stipulation "was not a minor point" in the CSX litigation. Every single court at each level of those proceedings relied on the stipulation. After the first bench trial, the district court analyzed only whether the state had justified the exemptions for motor carriers and water carriers. *CSX Transp.,*

*Inc.*, 892 F. Supp. 2d at 1312–17.  It selected those two classes of competitors based on the stipulation.  *Id.* at 1303, 1305.  We followed suit.  *CSX Transp., Inc.*, 720 F.3d at 869.  Importantly, so did the Supreme Court:  "[t]he first question" in *CSX II*, the Court explained, "[wa]s who is the 'comparison class' for purposes of a subsection (b)(4) claim."  *CSX II*, 575 U.S. at 26.  Noting that "[t]he parties [had] stipulate[d] that rail carriers, motor carriers, and water carriers compete," the Court concluded that, "in light of . . . [that] stipulation, a comparison class of competitors consisting of motor carriers and water carriers [is] appropriate, and differential treatment vis-à-vis that class [] constitute[s] discrimination."  *Id.* at 24, 30.

The Court's reasoning plainly relied on the state's stipulation—we said so outright in *CSX III*.  *CSX III*, 888 F.3d at 1180 ("[W]e are supremely reluctant to allow a district court to relitigate a stipulated fact that the Supreme Court relied on for one of its holdings, which is that rail carriers and water carriers are a similarly situated comparison class.").  The Court didn't announce that water and motor carriers were always the proper comparison class for all rail carriers; that question wasn't before it.  But in accepting that water and motor carriers were the proper comparison class of competitors for CSX specifically, it necessarily accepted that the state meant what it'd said.  Again, the stipulation doesn't mention CSX specifically.  The only reading that allowed the Court to apply the stipulation to resolve CSX's case, then, was that "rail carriers in the transportation of property . . . in the State of Alabama" meant *all* rail carriers in the transportation of property in the State of

Alabama.  Any other reading would have rendered the stipulation meaningless.

On top of all that, we relied again on the stipulation when the case returned to us in *CSX III*.  Taking the stipulation at face value, we held that the district court erred by finding "that competition between CSX and water carriers [wa]s insubstantial" when the parties had stipulated that rail and water carriers "principal[ly]" compete.  *Id.* at 1180.  Far from reimagining the stipulation, as the state urges us to do, we relied on each of its words.  And by accepting that rail and water carriers "principal[ly]" compete, we necessarily accepted that they compete.

That the state didn't ultimately prevail in the CSX litigation is of little relevance.  Again, at every juncture, the state told the judicial system to accept a fact about the rail-carrier industry:  rail carriers principally compete with motor and water carriers.  At every level, the judicial system accepted that fact.

We therefore see no clear error in the district court's finding that "[a]llowing the [s]tate to assert a contrary position now would undermine the Court's proceedings," and that estopping the state from doing so would "protect the integrity of the judicial process."

### c.  The State's Counterarguments Fail

The state offers several other reasons it believes the district court's conclusion is wrong.  First, it contends that its reversal on the factual issue of competition was "an appropriate response to a changed legal landscape" to which estoppel shouldn't have been

applied.  It then raises other equitable considerations it believes supports its position.  All of these arguments fail.

First, there's no merit to the state's argument that parties may diametrically contradict a stipulated fact because the law changes.  The only binding authority the state points to is *Logan Lumber*.  *Logan Lumber Co. v. Comm'r*, 365 F.2d 846, 854–55 (5th Cir. 1966).  That case, the state claims, held it "inappropriate to bind a party to a stipulation when an intervening change in law changes the relevance of previously stipulated facts."  But that's not quite right.  *Logan Lumber* held that we may allow a party to take a different legal position—not a different factual position—when there's been an intervening change in the law.  There, a taxpayer stipulated that it had incurred a certain amount of "legal and accounting expenses" in unsuccessfully defending against a criminal prosecution.  *Id*. at 854.  At the time of the stipulation, "the law seemed settled . . . [that] litigation expenses in the unsuccessful defense of criminal charges were not considered deductible."  *Id*.  In those circumstances, "it was only natural . . . that the present taxpayer would stipulate what its legal and accounting expenses were and agree these were not deductible"—so that's what it did.  *Id*. at 854–55.  During the taxpayer's appeal to the former Fifth Circuit, though, the Supreme Court decided that such expenses were deductible.  *Id*. at 854 (citing *Comm'r v. Tellier*, 383 U.S. 687 (1966)).  The court therefore "relieved" the taxpayer "of the effect of th[e] stipulation" because he'd entered it "under a mistake of law."  *Id*. at 855.  It remanded the case so that the Tax Court could consider "the issue of deduction."  *Id*.

According to the state, *Logan Lumber* compels us to relieve it of the stipulation because, while the other railroads' cases were stayed, the Supreme Court affirmed the "competitive approach." That legal change made competition legally significant when it wasn't before. For two reasons, *Logan Lumber* doesn't compel that result. First, the former Fifth Circuit relieved the taxpayer only of the legal effect of his stipulation—that the expenses weren't deductible because he'd incurred them during an unsuccessful criminal defense. It didn't suggest that he wasn't bound to the facts to which he'd stipulated—that he'd incurred a certain amount of expenses during an unsuccessful criminal defense. In this case, the state's stipulation that rail carriers compete with motor and water carriers is analogous to the amount of and reason for the taxpayer's expenses in *Logan Lumber*. Unlike the taxpayer, the state never stipulated to the legal import of any particular fact about competition. It simply stipulated to a fact: rail carriers (principally) compete with water carriers. The former Fifth Circuit didn't remand the case for the taxpayer to claim an entirely new amount for his expenses. By that token, *Logan Lumber* doesn't require us to allow the state to take an entirely new position of fact.

Second, even if the competition stipulation were somehow a legal position rather than a factual one—and we don't see how it could be—there was no relevant intervening change in the law here. The Supreme Court held in *CSX I* that "a state excise tax that applies to railroads but exempts their interstate competitors is subject to challenge under" the 4-R Act. *CSX I*, 562 U.S. at 288. That decision, handed down in 2011, meant that competition mattered

to any discriminatory-taxation claim. Setting aside the answer and preliminary injunction papers, the state repeated its stipulation in April 2012 and July 2016, even after *CSX II*. Simultaneously, the state litigated the legal significance of competition, "maintain[ing] that competitors were not an appropriate comparison class up until the Supreme Court resolved the issue in *CSX II*." But that the state was ultimately wrong about the law doesn't mean the law changed the way it had in *Logan Lumber*. Again, in that case, the governing law at the time of the stipulation was "settled" that litigation expenses weren't deductible. Then the Supreme Court held that they were deductible. Here, in contrast, the Supreme Court held that competition mattered, *CSX I*, 562 U.S. at 288, and then held that it had meant what it had said, *CSX II*, 575 U.S. at 30. That's not a change in the law.

All the other out-of-circuit cases the state points to are inapposite because, like *Logan Lumber*, and unlike here, they did involve a meaningful change in the law. *See, e.g.*, *Saleh v. Bush*, 848 F.3d 880, 887 n.5 (9th Cir. 2017) (holding that, because the 1988 Westfall Act had changed the scope of federal-employee tort liability, the United States wasn't bound to the legal position it had taken during the Nuremberg trials about the President's entitlement to immunity); *Longaberger Co. v. Kolt*, 586 F.3d 459, 470–71 (6th Cir. 2009) (declining to estop a plaintiff from pursuing a certain ERISA remedy it had previously declined to seek under existing law where an intervening Supreme Court decision changed the law to make the remedy available), *partially abrogated on unrelated grounds by Montanile v. Bd. of Trs. of Nat'l Elevator Indus. Health Benefit Plan*, 577 U.S. 136,

141 & n.2 (2016); *Biomedical Pat. Mgmt. Corp. v. Cal., Dep't of Health Servs.*, 505 F.3d 1328, 1341–42 (Fed. Cir. 2007) (declining to estop a state agency from asserting sovereign immunity to a patent suit simply because it hadn't done so in an earlier patent suit, where an intervening Supreme Court decision announced for the first time that sovereign immunity was available in such suits); *Jarrard v. CDI Telecomms., Inc.*, 408 F.3d 905, 915 (7th Cir. 2005) (declining to estop a party from urging a different "reading of [a] [state] statute" after intervening state-court decisions "interpreted the statute the other way"); *United States v. Vastola*, 989 F.2d 1318, 1324–25 (3d Cir. 1993) (declining to estop the United States from raising a new argument where intervening Supreme Court precedent nullified the argument on which it had initially relied, and where the United States wasn't legally or factually contradicting its earlier position); *Brandon v. Interfirst Corp.*, 858 F.2d 266, 269 (5th Cir. 1988) (declining to estop a defendant from asserting the defense of ERISA preemption where, before an intervening Supreme Court case held otherwise, the defendant had admitted that ERISA preemption wasn't a basis for removal).

Finally, the state's other equitable arguments also fail. The state insists that "[i]nconsistencies in a party's statements during litigation are supposed to add to the adversary process, not destroy it" (alteration in original), but that's true only when the party doesn't intend to make a mockery of the judicial system. The doctrine of judicial estoppel would be toothless otherwise. The state also contends that applying estoppel would deliver an "undue windfall" to the railroads who don't compete with water carriers.

But, under *Slater*, we consider a party's "level of sophistication" in weighing its intent. *Slater*, 871 F.3d at 1185. Here, the state was represented by capable attorneys at every stage of these proceedings. It was better situated than any other party to know what it'd mean to concede without qualification that one segment of the freight industry principally competes with another. The state can hardly complain about the consequences of its concession.

The state offers as a last-ditch argument that estopping it now would "forever" estop it from denying that rail carriers compete with water carriers "regardless of the significant changes in transportation that have occurred over the past decade and will continue to evolve in the future." We take no position on whether the state might someday, in another case, show that the freight-carrier ecosystem has changed such that the federal courts should relieve it of the CSX stipulation. With respect to the case actually before us, suffice it to say that we shouldn't relieve the state of the stipulation here. The state has conspicuously never identified any such industrywide change, here or before the district court. And, as we noted earlier, the state repeated the CSX stipulation even after the "changed maritime conditions" caused by the BP oil spill. The equities here demonstrate that the district court did not abuse its discretion when it applied judicial estoppel.[6]

---

[6] Because the state didn't raise the issue, we "need not decide the extent to which [judicial estoppel] can be applied against a state[,] if at all." *Prison Legal News*, 890 F.3d at 969 n.12 (citing *Heckler v. Cmty. Health Servs. of Crawford Cnty., Inc.*, 467 U.S. 51, 60–61 (1984)); *see Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 680 (11th Cir. 2014) (holding that issues not raised in a party's opening

### d.  The Dissenting Opinion

Against all of this, the dissenting opinion offers four reasons why we shouldn't judicially estop the state from contradicting the CSX stipulation:  (1) it was made before the 4-R Act was interpreted by the Supreme Court; (2) it did nothing to help the state's case; (3) the Supreme Court, in *Keathley v. Buddy Ayers Construction, Inc.*, 146 S. Ct. 1532 (2026), signaled that courts of appeals should rein in the judicial-estoppel doctrine; and (4) policy considerations caution against applying it here.  We're not persuaded.

First, even after the Supreme Court rejected the state's reading of the 4-R Act, *CSX II*, 575 U.S. at 30, the state repeated its stipulation.  It reaffirmed the stipulation at the second bench trial.  And it stuck by the stipulation on appeal and doubled down on rehearing.

Second, the stipulation did help the state's litigation position.  As the district court found, the state "delayed discovery regarding competition in the consolidated cases for years in the hope that it could use its broad stipulation to avoid discovery altogether."  The dissenting opinion has a different view, but it misunderstands the standard of review.  We review the district court's intent finding for clear error.  *Robinson*, 595 F.3d at 1275.  Under that standard, "a finding that is 'plausible' in light of the full record—even if another is equally or more so—must govern."  *In re Wagner*, 115 F.4th 1296,

---

brief are forfeited).  As in *Prison Legal News*, we leave that matter for another day.

1305 (11th Cir. 2024) (quoting *Cooper v. Harris*, 581 U.S. 285, 293 (2017) (citation modified)).  The district court's intent finding was plausible.  That means we're bound by it, even if we're "convinced that [we'd] have weighed the evidence differently in the first instance." *Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 687 (2021) (citing *Anderson v. Bessemer City*, 470 U.S. 564, 573–74 (1985)).

Third, neither the district court's analysis nor ours conflicts with *Keathley*.  *Keathley* held that courts applying judicial estoppel to a party's inconsistent position must take a holistic approach, looking to the "totality of the circumstances" surrounding the inconsistency.  146 S. Ct. at 1536.  That's exactly what the district court did in granting judgment on the pleadings for the railroads.  It analyzed "the totality of the circumstances surrounding" the stipulation.  And that's what we've done in these forty-plus pages reviewing the judgment.

And fourth, we decide this appeal based on the law and not our policy preferences.[7]

## C. DERIVATIVE TAXING AUTHORITY

For these reasons, the district court correctly granted judgment on the pleadings for the railroads against the state.  The state

---

[7] One final note.  This decision is not buried.  As with all of our opinions, this one is publicly available on our website and on the commercial databases.  And we're confident the Supreme Court knows where to find it.  It's had no trouble reviewing our unpublished opinions, as it already has in these 4-R Act cases.  *See, e.g.*, *CSX Transp., Inc. v. Ala. Dep't of Revenue*, 350 F. App'x 318, 319 (11th Cir. 2009), *rev'd*, 562 U.S. 277 (2011).

effectively admitted the first element of the railroads' discriminatory-taxation claim—that they move people or property along an interstate rail network—by admitting that the railroads engaged in interstate commerce as rail carriers.  It never disputed that the diesel tax was "another tax" within the meaning of the 4-R Act, thereby conceding the second element.  And finally, it was judicially estopped from denying the third element.  The 4-R Act therefore forbade the state from imposing the diesel tax on the railroads but not on water carriers.

This matters to the local governments because, in Alabama, cities and counties derive their taxing authority solely from the state—and the state can only delegate taxing authority that it itself possesses.  Because the state is forbidden from imposing the diesel tax on the railroads, the local governments are forbidden from exercising the same delegated authority from the state.

### 1. *Standard*

State control of local governments is a signal feature of Alabama's constitution.  Although the state recompiled its constitution in 2022, the substance dates back to 1901.  The 1901 constitution sharply limited local autonomy, vesting all the state's legislative power solely in the legislature, ALA. CONST. art. IV, § 44 (1901); *see also* ALA. CONST. art. IV, § 44 (2022), and forbidding the legislature from delegating those powers except where the constitution itself authorizes, *Wallace v. Bd. of Educ. of Montgomery Cnty.*, 197 So. 2d 428, 434 (Ala. 1967).

The Alabama constitution is perhaps most limiting when it comes to taxation.  The Alabama Supreme Court has been very clear:  "[m]unicipalities have no inherent power of taxation, although the state may confer upon municipalities the power to tax." *City of Mobile v. GSF Props., Inc.*, 531 So. 2d 833, 836 (Ala. 1988) (collecting cases); *see also Jefferson County v. Richards*, 805 So. 2d 690, 706 (Ala. 2001) ("Counties, being political subdivisions of the state, have no inherent power of taxation but have only such taxing power as the Legislature delegates to them.").  "When the [s]tate does confer upon municipalities the power to tax, the presumption is that the [s]tate delegates only such power as the [s]tate itself possesses."  *GSF Props., Inc.*, 531 So. 2d at 837.  And "even if there [a]re no other limitations upon the power of municipalities to collect . . . taxes, such municipal power [is] limited to the power possessed by the [s]tate."  *Id.*

Applying this principle, the Alabama Supreme Court has repeatedly held that local governments do not have the power to impose taxes that the state does not have the power to impose.  In *GSF Properties*, for instance, the Alabama Supreme Court construed a statute purporting to give municipalities a license-tax lien "superior to all other liens, except the lien[s] of the state [and] county." *Id.* at 835 (quoting Ala. Code § 11-51-96).  The City of Mobile sued to enforce its license-tax lien against a motel already encumbered by a prior mortgage lien.  *Id.* at 834.  Pointing to the statute, the city argued that "superior to all other liens" meant what it said, so its lien took priority over the prior mortgagee's.  *See id.* at 835.  But the Alabama Supreme Court disagreed, explaining that, under

Alabama law, the state itself couldn't enforce a license-tax lien against the property of a prior mortgagee—only against the property of the delinquent licensee. *Id.* at 835–36. Because the state "d[id] not possess the power to look beyond the property of the actual licensee in enforcing its license taxes," the city didn't possess that power either. *Id.* at 837. As the court summed it up, "[t]he [c]ity may not rely on [state law] to establish taxing power greater than that possessed by the [s]tate." *Id.*

The Alabama Supreme Court reached the same conclusion in *Orbitz*. *City of Birmingham v. Orbitz, LLC*, 93 So. 3d 932, 936–37 (Ala. 2012). There, the state had imposed a lodgings tax and delegated to its municipalities the power to impose a parallel local tax. *Id.* at 935. The City of Birmingham sought to collect a lodgings tax from online travel service providers, who argued that the tax didn't apply to them. *Id.* at 934–35. A state trial court sided with the online providers. *Id.* at 936–37. Because the "plain meaning" of the state tax excluded online travel service providers, and because "municipalities do not have the power to tax on their own authority," the circuit court concluded that municipalities couldn't tax the online providers either. *Id.* at 935–36. The Alabama Supreme Court affirmed, "adopt[ing] [the trial court]'s order in its entirety" as its own opinion. *Id.* at 937.

### 2. Analysis

The logic of *GSF Properties* and *Orbitz* applies in the same way here. The local governments derive their power to tax railroad diesel from the state, which allows counties and

municipalities to impose only taxes parallel to the state's. *See* Ala. Code. §§ 11-3-11.2, 11-51-200. Since the 4-R Act prohibits the state from exercising its taxing authority to tax diesel for railroads while exempting water carriers, the local governments cannot exercise the same delegated authority to impose a parallel discriminatory tax. *Accord GSF Props., Inc.*, 531 So. 2d at 836–37; *Orbitz*, 93 So. 3d at 936–37. For that reason, judgment on the pleadings was proper against the local governments.

Nevertheless, the local governments insist that the district court couldn't have enjoined their diesel taxes under the 4-R Act's exception to the Tax Injunction Act unless it determined that each of their specific taxes was discriminatory. We disagree. Again, under Alabama law, local governments don't have the power to tax in their own right. When they tax, they're doing so based on delegated state power. So a 4-R Act injunction blocking the state from exercising the power to impose a discriminatory tax necessarily applies to the local governments exercising the same delegated power to impose the same tax. *Cf. Ute Indian Tribe of the Uintah & Ouray Rsrv. v. Utah*, 790 F.3d 1000, 1008 (10th Cir. 2015) (Gorsuch, J.) ("[C]ounties are usually thought to be in privity with their states for preclusion purposes when the state has lost an earlier suit."); *Grand Traverse Band of Ottawa & Chippewa Indians v. Dir., Mich. Dep't of Nat. Res.*, 141 F.3d 635, 642 (6th Cir. 1998) (holding that a state department and two local subdivisions were "instrumentalities of the state" and therefore bound by a consent order entered against the state). The State of Alabama's taxing authority may not

be used to discriminate under the 4-R Act, no matter the entity the state tasks with exercising the authority.

## IV. CONCLUSION

For these reasons, we affirm the district court's judgment on the pleadings and its grant of injunctive and declaratory relief against both the state and the local governments.

**AFFIRMED.**

21-11371                TJOFLAT, J., Dissenting                1

TJOFLAT, Circuit Judge, dissenting:

## I. INTRODUCTION

Squeezed down, this appeal asks but one question: whether the State of Alabama should be judicially estopped from litigating a disadvantageous factual stipulation it made in a separate case with a separate plaintiff some fifteen years ago. The answer, in my view, is a resounding no. Therefore, I respectfully dissent.

⋆                ⋆                ⋆

In the CSX Transportation, Inc. ("CSX") litigation, the Alabama Department of Revenue (the "Department" or the "State") adopted what it thought was its best legal strategy to defend its system of taxation against allegations that it discriminated against railroads in violation of federal law. Namely, the State argued that—while its tax on diesel fuel consumed by railroads was higher than the tax on diesel fuel consumed by some railroad competitors—the system as a whole did not "target or single out railroads for discrimination" because railroads "d[id] not pay a disproportionate amount of taxes in comparison to other commercial and industrial taxpayers."

In so doing, Alabama made a series of stipulations that were not integral to its theory of the case. Relevant here, the State stipulated that "[t]he principal competitors to rail carriers in the transportation of property in interstate commerce" are, among others, "carriers of property in interstate commerce by ships, barges, and other vessels" (the "Principal Competitor Stipulation"). That stipulation *did nothing to further Alabama's case*. In fact, as the State would

later learn, that stipulation would largely foreclose any chance at victory in that case once the Supreme Court elucidated the standard for railroad tax discrimination.

What the Principal Competitor Stipulation did accomplish is something all too rare in today's district court litigation. It served to narrow the issues and simplify the question at trial, thereby saving the parties unnecessary litigation expense and conserving precious judicial resources. Today's Majority punishes that behavior. In binding the State of Alabama to a disadvantageous position it took in a different case with different parties before the relevant statute had been interpreted by the Supreme Court, we now instruct litigants to adhere to the mantra: "Admit nothing. Deny everything."

## II. BACKGROUND

The Majority aptly describes the statutory layout, the history of the CSX litigation, and the District Court's proceedings in the case at hand. For purposes of my dissent, I offer a condensed background with only the most relevant facts.

### A. The Statutes & The CSX Litigation

Alabama imposes a sales and use tax on diesel at a rate of four percent. Ala. Code. §§ 40-23-2(1), 40-23-61(a). The State exempts from this tax all fuel sold to ships, vessels, and other watercraft engaged in interstate or international commerce ("Water Carriers"), *id.* § 40-23-4(a)(10), as well as fuel sold to motor vehicles transporting goods by highway ("Motor Carriers"). *Id.* § 40-17-

21-11371                  Tjoflat, J., Dissenting                  3

325(b). It offers no such exemption for railroads, like CSX and BNSF ("Rail Carriers").

These select exemptions would ordinarily rest comfortably within the sound discretion of the Alabama legislature.[1] But Congress, wielding the Supremacy Clause, has muddied the waters. *See* U.S. Const. art. VI, cl. 2. In passing the Railroad Revitalization and Regulatory Reform Act of 1976 (the "4-R Act"), Congress made it unlawful for any state or locality to impose a tax "that discriminates against a rail carrier providing transportation." Pub. L. No. 90-210, § 306, 90 Stat. 31 (codified as amended at 49 U.S.C. § 11501). And it provided Rail Carriers with a private right of action to seek relief in the face of an unlawful tax. *See* 49 U.S.C. § 11501(c). Exactly what it means for a tax to "discriminate[] against a rail carrier," however, was undefined and hence left to the courts.

In April 2008, CSX filed a complaint against the Department alleging that Alabama's sales and use tax on diesel fuel used for rail transportation was "discriminatory and unlawful" under the 4-R Act. CSX alleged that the "principal competitors" to railroads were Motor Carriers and Water Carriers, who were exempt from the tax. Rail Carriers, by contrast, were not exempt. Thus, CSX alleged that the tax violated the 4-R Act, and it sought declaratory and injunctive relief.

---

[1] And, as the Majority points out, the Tax Injunction Act generally prevents suits in federal court for injunctive relief against the enforcement of a state tax. *See* 28 U.S.C. § 1341.

The Department faithfully answered the complaint a few weeks later. While it denied that its tax was unlawful, it accepted most of the complaint's factual premises, including that Motor Carriers and Water Carriers were the railroad's "principal competitors." The Department filed a motion to dismiss (on grounds rather extraneous to the case at hand), which the district court granted. Our Court affirmed, and the Supreme Court reversed, sending the case back for trial. *CSX Transp., Inc. v. Alabama Dep't of Revenue (CSX I)*, 562 U.S. 277, 131 S. Ct. 1101 (2011).

In advance of trial, the district court ordered the parties to prepare a joint statement of agreed-upon facts and principles of law, as well as a statement of disputed facts and disputed conclusions of law. The document filed by the parties included the following agreed-upon statement of fact:

> The principal competitors to rail carriers in the transportation of property in interstate commerce in the State of Alabama are on-highway motor carriers of property in interstate commerce ("motor carriers") and carriers of property in interstate commerce by ships, barges and other vessels ("water carriers").

The reason the Department chose to admit this fact, rather than litigate it, is simple: Any litigation of its veracity would have little to no bearing on the outcome under the Department's chosen theory of the case. That is, the Department argued that the appropriate comparator class for ascertaining discrimination should be all other commercial and industrial taxpayers, not just Rail Carriers' direct competitors. It believed this approach was proper

21-11371                   TJOFLAT, J., Dissenting                   5

because the sales and use tax at issue was generally applicable, extending well beyond the interstate freight industry. So, to the Department, the best inquiry under the 4-R Act was whether the tax "targeted or singled out railroads"—not whether a given railroad was disadvantaged vis-à-vis specific industry competitors. And the district court agreed.

Unfortunately for the Department, the case went back up to the Supreme Court, and the Court expressly rejected the Department's view of the 4-R Act. *Alabama Dep't of Revenue v. CSX Transp., Inc. (CSX II)*, 575 U.S. 21, 135 S. Ct. 1136 (2015). Specifically, the Court held in *CSX II* that "a comparison class of competitors consisting of motor carriers and water carriers was appropriate" in light of the Department's stipulation as well as Congress' stated policy aim to "foster competition among all carriers by railroad and other modes of transportation." *Id*. at 29–30, 135 S. Ct. at 1142–43.

*CSX II* did not dispose of the litigation, but it certainly narrowed the Department's path to victory. And, although the Department managed to secure a favorable verdict after a second bench trial, our Court had the final say. We reversed, and ordered the district court to enter judgment for CSX. *CSX Transp., Inc. v. Alabama Dep't of Revenue (CSX III)*, 888 F.3d 1163, 1187 (11th Cir. 2018). We held (1) that the State had not demonstrated a sufficient justification for its exemption of Water Carriers,[2] and (2) that the

---

[2] To be specific, we *did* find a justification for the Motor Carrier exemption, because Motor Carriers were subject to a separate tax that was "roughly equivalent" to the sales and use tax at issue. *CSX III* at 1179. But the unjustified

6                    TJOFLAT, J., Dissenting                    21-11371

Department was not free to litigate whether Rail Carriers competed with Water Carriers because CSX had stipulated *in that very case* that the Motor and Water Carriers were their principal competition. *Id.* at 1180, 1187. At long last, the CSX litigation was resolved.

## B. The Instant Case

This appeal is *not* from the CSX case. That case was closed in 2019 with the district court's entry of declaratory judgment and permanent injunctive relief, as directed by the Court of Appeals. The instant case began when the BNSF Railway Company ("BNSF") filed a complaint against the Department in 2011, and it was stayed pending a final result in *CSX III*. In 2020, that stay was lifted, and the case was consolidated with similar lawsuits brought against the Department by five other railroads asserting violations of the 4-R Act.

There is no denying the obvious overlap between the consolidated cases at hand and the earlier CSX litigation. BNSF's complaint, for example, was no more than a copy-and-paste version of CSX's complaint with edits to reflect a different plaintiff and a new Secretary of the Department. Like CSX, BNSF asserted in its complaint that Alabama's sales tax discriminated against railroads by exempting Rail Carriers' principal competitors, Motor and Water Carriers.

---

Water Carrier exemption was sufficient for us to conclude the tax violated the 4-R Act. *Id.* at 1187.

21-11371                TJOFLAT, J., Dissenting                7

But the cases nonetheless constitute different proceedings. And here, unlike in the CSX litigation, the Department never conceded that Water Carriers constitute the plaintiffs' principal competitors. In its answer to BNSF's initial complaint, the Department responded to that allegation as follows:

> After a reasonable inquiry the Department does not have sufficient information to either admit or deny whether carriers of property in interstate commerce by ships, barges, or other vessels ("water carriers") are at this time a principal competitor to rail carriers, due to changed maritime conditions in Alabama because of the BP oil spill.

Then, after the stay was lifted in 2020, BNSF amended its complaint. This time, when the Department answered the amended complaint, it opted to specifically deny the allegation and demand strict proof thereof:

> The Department denies that carriers of property by ships, barges or other vessels ("water carriers") engaged in interstate commerce . . . are principal competitors to railroads in the State of Alabama generally and/or BNSF particularly. The Department states that, for instance, publicly available information on the Alabama Department of Transportation's website indicates that BNSF's only railway line in Alabama is limited to 115 miles of track running through Lamar, Marion, Fayette, Walker and Jefferson Counties (counties unconnected by navigable waterways).

Suffice to say, the Department has not conceded in this litigation that Water Carriers compete with BNSF. The same can be said with respect to the consolidated cases; neither the Department nor any other state defendant has conceded that Water Carriers are principal competitors to the plaintiff-railroads. So, if we are going to bind the State to a stipulation it made in a different proceeding, there ought to be a doctrine instructing us to do so.

The District Court found the doctrine of judicial estoppel to be both on point and dispositive. The Majority affirms. For the reasons discussed in the following Part, I believe that this application of judicial estoppel constitutes an unwarranted extension of the doctrine.[3]

### III. DISCUSSION

"Stated simply, the doctrine of judicial estoppel rests on the principle that 'absent any good explanation, a party should not be allowed to gain an advantage by litigation on one theory, and then seek an inconsistent advantage by pursuing an incompatible theory.'" *Slater v. U.S. Steel Corp.*, 871 F.3d 1174, 1180–81 (11th Cir. 2017) (en banc) (quoting *Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 358 (3d Cir. 1996)). It is an equitable doctrine "intended to prevent the perversion of the judicial process" and "is to be applied where intentional self-contradiction is being used as a means of obtaining unfair advantage."[4] 18 Moore's

---

[3] The Majority correctly states the standard of review. *See* Maj. Op. at 17.

[4] Unlike most equitable doctrines, whose English roots extend back centuries, judicial estoppel is a relatively recent phenomenon. It first appeared in the

21-11371                    TJOFLAT, J., Dissenting                    9

Federal Practice § 134.30 (3d ed. 2018) (quoting *In re Cassidy*, 892 F.2d 637, 641 (7th Cir. 1990)).

As the Majority identifies, our Circuit evaluates whether judicial estoppel is appropriate under different tests "depending on whether the party seeking to apply it was a party to the prior proceeding in which the other party took an inconsistent position." *United States v. Munoz*, 112 F.4th 923, 934 (11th Cir. 2024). Here, because the parties seeking to invoke judicial estoppel (i.e., the Appellee-railroads) were *not* parties to the CSX litigation, we follow the two-part test set forth in our en banc opinion in *Slater*.[5] That test asks: (1) whether "the party took an inconsistent position under oath in a separate proceeding," and (2) whether "these inconsistent positions were calculated to make a mockery of the judicial

---

Tennessee Supreme Court in 1857 but failed to catch on in other states. *Keathley v. Buddy Ayers Constr., Inc.*, No. 25-6, slip op. at 1 (U.S. June 11, 2026) (Thomas, J., concurring). The doctrine nonetheless gained widespread acceptance after the Supreme Court's 2001 opinion in *New Hampshire v. Maine*, 532 U.S. 742, 121 S. Ct. 1808 (2001), notwithstanding that case's peculiar factual and procedural background. *Id.* at 3–5.

[5] The District Court erroneously applied the three-part test from *New Hampshire*, making only a passing mention to our decision in *Slater* and suggesting, contrary to our binding precedent, that *Slater* may only apply in the bankruptcy context. *See Slater*, 871 F.3d at 1182 (explaining that the Supreme Court's *New Hampshire* test does not govern cases where the party seeking to invoke judicial estoppel was not a party to the earlier proceeding). Nonetheless, as Appellees note in their brief on appeal, this error appears to have been (somewhat inexplicably) invited by the State. That is, the State requested the incorrect standard even though the correct standard was objectively more favorable to the State.

10                    TJOFLAT, J., Dissenting                    21-11371

system." *Slater*, 871 F.3d at 1181 (internal quotation marks omitted).

I concur entirely with the Majority's conclusion that the State took inconsistent positions. Yesterday, it stipulated that Water Carriers are a principal competitor to railroads. Today, it says that the two hardly compete at all. Therefore, I limit my dissent to a discussion of the second element: whether the State's change in position was "calculated to make a mockery of the judicial system." *Id*. I believe that, because the Principal Competitor Stipulation was designed to streamline the CSX litigation, and because that stipulation played no role in helping the State win that case, applying judicial estoppel here is inappropriate.

### A. Unwinding a Disadvantageous Stipulation Cannot Make a Mockery of the Judicial System

In my view, judicial estoppel can be summed up by the idiom "you can't have your cake and eat it too."[6] *See Have One's Cake*

---

[6] Some prefer the original phrasing of the idiom, "you can't eat your cake and have it too." Esteemed literary critic John Simon once wrote:

> The [original] form makes sense: once you've eaten the damned thing, you can no longer have it. Not so the later, corrupt form: you can have your cake—enjoy looking at it, or keep it in the freezer or have it set aside for you at the bakery— and then, at the proper moment, eat it, too. But some dolt somewhere along the line reversed the order, and it stuck.

Brian A. Garner, Garner's Legal Dictionary of Legal Usage 980 (4th ed. 2016) (quoting John Simon, *Thoroughly Modern Burchfield*, 15 New Criterion 66, 69).

21-11371                TJOFLAT, J., Dissenting                11

*and Eat It Too*, Merriam-Webster, https://www.merriam-webster.com/dictionary/have%20one's%20cake%20and%20eat%20it%20too (last visited June 17, 2026). In other words, judicial estoppel exists to prevent a litigant from reaping all the rewards of taking a particular legal or factual position without accepting the consequences, future or contemporaneous, associated with that position.

Until today, our Court has applied judicial estoppel with this principle in mind. Under the second prong of our *Slater* analysis, a litigant only makes a mockery of the judicial system if, after reviewing the totality of the facts and circumstances, the court determines that such litigant intended to mislead the court to get an unfair edge in each case. *See* 871 F.3d at 1185–86. And even then, it is to "apply only when the [party's] conduct is egregious enough that the situation 'demands equitable intervention.'" *Id.* at 1187 (alterations adopted) (quoting *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 248, 64 S. Ct. 997, 1002 (1944)).

In fact, since *Slater*, this Court has only one published opinion upholding a district court's finding that a litigant should be estopped for making a mockery of the judicial system. There, in a brief per curiam opinion, we upheld a district court's decision to shut down two lawsuits brought by a plaintiff because of the plaintiff's failure to disclose the suits in bankruptcy. *Weakley v. Eagle Logistics*, 894 F.3d 1244, 1244–48 (2018). Judicial estoppel applied, we held, because there was evidence that the plaintiff intentionally misled the bankruptcy court so as to "benefit financially at his creditors' expense." *Id.* at 1246.

12                    Tjoflat, J., Dissenting                    21-11371

We have published no opinion finding a mockery where the original position at issue was not taken by a party to serve that party's interest in that litigation. We have certainly not affirmed a judicial estoppel ruling based on a party's prior *concession*, admitted for the purposes of narrowing a litigation. In my view, then, today marks an uncharted expansion of the doctrine.[7]

★          ★          ★

Perhaps a good-faith reading of the Majority does not reveal a sharp deviation from my outlined cake-eating principle, but merely a broader interpretation thereof. While the Majority does not contend that the State's Principal Competitor Stipulation helped its likelihood of success in the CSX litigation, it does suggest that it furthered the State's broader litigation scheme by allowing it to "hedge its bets." Maj. Op. at 27. That argument goes: if the State's principal strategy won in *CSX II*, it would foreclose other plaintiffs from challenging the law. And if its principal strategy lost, the Department could protract the litigation by unwinding its stipulation and choosing to litigate the competition issue.

This theory, however, fails to adequately explain why the Department would be better off in the latter scenario, which it now finds itself in, compared to the scenario where it litigated all salient issues (or issues it believed to be salient) upfront in the CSX case. Presumably the Department's goal was not to lose that case just to

---

[7] And we do so at a time when the Supreme Court appears to be looking to rein it in. *See infra* note 9 and accompanying text.

21-11371                 TJOFLAT, J., Dissenting                 13

try again on the others. Rather, I presume that its goal was to defend its law effectively from the start. When it lost in *CSX III*, the State was permanently enjoined from collecting its sales and use tax on diesel fuel from CSX until it changed the law—a decidedly unfavorable outcome for the State.[8]

Unpersuaded to the contrary, I am of the view that the Principle Competitor Stipulation did nothing to help the Department. It appears as though the Department took an early, calculated risk that the competition issue was not worth fighting given the State's understanding of the law. And so, it spared the parties and the courts the expense of fighting it.

But even if the State's stipulation *was* part of a broader, more cunning litigation strategy, I would still decline to allow judicial estoppel here. Probing a party's litigation strategy at this level of granularity is not an appropriate role of the courts and is bound to lead to unwise applications of estoppel.

I believe judicial estoppel should be cabined to clear-cut reversals on positions a party previously fought for, not those it conceded. Accordingly, I would decide this case by holding that any non-dispositive prior concession (i.e., disadvantageous legal or

---

[8] And to the extent that the Majority is right—that the State sought a specific holding from the courts about the broad permissibility of its tax—this would hardly mark the first time a litigant has tried to guide the courts to adopt a specific rule of law.

14                    TJOFLAT, J., Dissenting                    21-11371

factual stipulation) cannot constitute the grounds for a subsequent invocation of judicial estoppel.

### B. Policy Cautions Against Expanding Judicial Estoppel

The policy underpinnings for keeping this doctrine at bay are robust. First, as Justice Thomas pointed out in a recent concurring opinion, it is not clear that federal courts have the power of 'judicial estoppel' in the first place.[9] *Keathley,* slip op. at 3 (Thomas, J., concurring) ("[T]he doctrine appears to have no basis in any statute, any Federal Rule of Civil Procedure, or any traditional inherent power of federal courts."). "And although federal courts often assume that the doctrine can arise from their general equitable authority . . . that 'equitable authority is not free-wheeling,' and requires us to use 'a founding-era antecedent.'" *Id.* at 3–4 (quoting *Trump v. CASA, Inc.*, 606 U.S. 831, 841, 846–847, 145 S. Ct. 2540, 2254 (2025)).

---

[9] Beyond Justice Thomas' concurrence, which was joined by Justice Gorsuch, the entire Court in *Keathley* expressed some concern about lower courts' use of the doctrine. Writing for the 9–0 Court, Justice Jackson wrote that the Fifth Circuit's application of judicial estoppel to an unwitting Chapter 13 bankruptcy filer who failed to disclose his personal injury claim to the Bankruptcy Court was improper. *Keathley,* slip op. at 3–5, 9. The Court held that the Fifth Circuit failed to consider the totality of the circumstances, including whether there was any intent to mislead the courts. *Id.* The Court did so while expressly leaving open the question of whether judicial estoppel can even apply in the bankruptcy context at all. *Id.* at 7. Justice Sotomayor concurred to express her view that "it may not ever make sense to apply judicial estoppel" because of bankruptcy proceedings. *Keathley*, slip op. at 1 (Sotomayor, J., concurring).

Second, in a case like this, where we are judicially estopping a state rather than a private litigant, the principles of federalism cry out. "When the Government is unable to enforce the law" due to an estoppel, "the interest of the citizenry as a whole in obedience to the rule of law is undermined." *Heckler v. Cmty. Health Servs. of Crawford Cnty., Inc.*, 467 U.S. 51, 60, 104 S. Ct. 2218, 2224 (1984). The Majority asserts that the issue of whether a federal district court may judicially estop a state is not properly before us on appeal because the Department failed to raise the issue. *See Maj. Op.* at 36 n.6. While that may be true, we are not precluded from weighing federalism concerns among the equities in our examination of the totality of the circumstances. *See Slater*, 871 F.3d at 1187 (explaining that "considering all the circumstances of the case . . . is the more flexible, less mechanical approach that equity demands").

Third, the Federal Rules of Civil Procedure, along with other longstanding equitable doctrines, are well equipped to keep unrelenting litigants at bay. Amicus curiae contends that we must affirm the District Court so as to reject "Alabama's goal . . . to require each railroad operating in the state to prove that it currently competes against water carriers." It contends that "[s]uch a scheme is not only legally deficient, it is unworkable." I disagree. Whatever Alabama's "goal" may be, there are plenty of alternatives to avoid the type of duplicative litigation amicus curiae and the Appellees so fear. Judicial estoppel is not the last line of defense.

For example, assuming the railroads are similarly situated, they can seek relief as a class. *See* Fed. R. Civ. P. 23. Or, as here, similar cases may be consolidated for the purpose of resolving similar issues. *See* Fed. R. Civ. P. 42 ("If actions before the court involve a common question of law or fact, the court may (1) join for hearing or trial any or all matters at issue in the actions; (2) consolidate the actions; or (3) issue any other orders to avoid unnecessary cost or delay."). Additionally, assuming one railroad's competitors have been fully litigated, Alabama would be bound by that result unless it had a good-faith basis to suggest a future plaintiff was differently situated in some legally pertinent way. *See* Fed. R. Civ. P. 11 ("By presenting to the court a pleading . . . an attorney or unrepresented party certifies that to the best of the person's knowledge, information and belief . . . the claims, defenses and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law.").

Finally, if the State should fail to concede future cases despite an utter lack of factual nuance, prospective plaintiffs could invoke collateral estoppel or move for sanctions. None of these tried and tested procedural tools carry the baggage of judicial estoppel, which, as applied here, threatens to unravel our process of narrowing issues before trial.

⋆          ⋆          ⋆

Before I conclude, a brief note on the Majority's decision not to publish this opinion. I write *for the second time in a matter of weeks* to highlight this Court's unfortunate and ongoing tendency to bury

21-11371                TJOFLAT, J., Dissenting                17

decisions of great magnitude. *See Jones v. Sec., Fla. Dep't of Corr.*, No. 24-14178, slip. Op. at 10–14 (11th Cir. July 23, 2026) (Tjoflat, J., dissenting). This case received the full benefit of oral argument. What's more, the Alabama tax provision at issue here has twice piqued the interest of the Supreme Court. And just last month, the Court signaled that the lower courts should proceed with caution when invoking judicial estoppel. *See Keathley*. Justice Thomas went further, writing that "[i]n a future case, this doctrine merits a closer look." *Id*. at 6 (Thomas, J. concurring). This very well may be that case—if anyone can find it.

## IV. CONCLUSION

For the foregoing reasons, I respectfully dissent.